UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| NALAKEIO L. BENNETT | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:21-CV-550 RLM-MGG |
| | ) | |
| WILLIAM HYATTE and | ) | |
| GEORGE PAYNE, JR., | ) | |
| | ) | |
| *Defendants* | ) | |

OPINION AND ORDER

Nalakeio Bennett has sued Warden William Hyatte and Deputy Warden George Payne, Jr., in their individual capacities, alleging that they subjected him to unconstitutional conditions of confinement while he was imprisoned at Miami Correctional Facility. Mr. Bennett sued from prison, so the Prison Litigation Reform Act's requirement that he exhaust all administrative remedies before suing over prison conditions applies. *See* 42 U.S.C. § 1997e(a). The defendants have moved for summary judgment, and Mr. Bennett has cross-moved for summary judgment, on the issue of exhaustion of administrative remedies. Mr. Bennett requests oral argument to present legal arguments but not additional evidence. Neither party requested a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

For reasons explained in this opinion and order, the court DENIES the defendants' motion for summary judgment [Doc. 12], GRANTS Mr. Bennett's

motion for summary judgment, [Doc. 32], and DENIES AS MOOT Mr. Bennett's request for oral argument. [Doc. 47].[1]

LEGAL STANDARD

Federal Rule of Civil Procedure 56 entitles a party to summary judgment when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The court construes all facts and reasonable inferences in the non-moving party's favor. Id. A court considering cross-motions for summary judgment "constru[es] all facts and draw[s] all reasonable inferences in favor of the party against whom the motion under consideration was filed." Hess v. Bd. of Trs. of S. Ill. Univ., 839 F.3d 668, 673 (7th Cir. 2016) (citation omitted). The existence of an alleged factual dispute, by itself, won't defeat a summary judgment motion; "instead the nonmovant must present definite, competent evidence in rebuttal," Parent v. Home Depot U.S.A., Inc., 694 F.3d 919, 922 (7th Cir. 2012), and "must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires

---

[1]     Mr. Bennett's action was consolidated for pretrial, non-dispositive matters with several other cases with similar allegations against the same defendants, [Doc. 10], and he requests consolidated oral argument. [Doc. 47]. The exhaustion defense is a dispositive matter, so the court resolves the issue in separate orders.

2

trial." Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); *see also* Fed. R. Civ. P. 56(e)(2).

A defendant isn't entitled to a jury trial on contested issues involving exhaustion. Wagoner v. Lemmon, 778 F.3d 586, 590 (7th Cir. 2015) (discussing Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008)). A court holds a Pavey hearing to resolve issues of fact bearing on exhaustion, but "[w]hen there are no disputed facts regarding exhaustion, only a legal question, the court may resolve the issue without a hearing. Vela v. Ind. Dep't of Corr., No. 3:16 CV 51, 2017 U.S. Dist. LEXIS 9279, at *2 (N.D. Ind. Jan. 24, 2017).


BACKGROUND

Nalakeio Bennett alleges that Warden Hyatte and Deputy Warden Payne violated his constitutional rights when they kept him in a restrictive housing unit cell at Miami Correctional Facility from early February to late March 2021. He alleges that his cell had broken lights and a window covered with sheet metal, so was extremely dark, and that he was allowed to leave his cell for no more than fifteen minutes each day. He claims that the extreme darkness caused several injuries, both physical and psychological. He claims this treatment violated his Eighth Amendment right to be free from cruel and unusual punishment and seeks to hold Warden Hyatte and Deputy Warden Payne accountable by way of 42 U.S.C. § 1983.

Mr. Bennett sued from prison, so the defendants aren't liable if they can show that Mr. Bennett didn't exhaust administrative remedies available to him. *See* 42 U.S.C. § 1997e(a).

*Miami Correctional Facility's Administrative Remedies*

Miami Correctional Facility receives and manages prison grievances according to the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, effective since September 1, 2020. In broad strokes, the policy requires that a prisoner complete a formal grievance and two appeals to exhaust a claim. The parties agree that the written policy is as follows.

A prisoner can complain about prison conditions by filing a grievance with the prison. The prison considers only certain issues appropriate for the grievance process, like staff treatment, medical or mental health, acts of reprisal, and other concerns about conditions of care and supervision in prison. A prisoner starts by completing a grievance on State Form 45471, to be completed no later than ten business days from the date of the incident giving rise to the complaint. An offender grievance specialist is to review any grievance within five business days of receiving the grievance. A specialist either rejects the grievance or accepts and records it. A grievance specialist can reject a grievance if it is untimely, relates to more than one event or issue, is illegible, and the like. A rejected grievance is returned to the prisoner with State Form 45475, "Return of Grievance." It is not

appealable, but a prisoner can submit a revised State Form 45475 within five business days of when the grievance is returned.

If a grievance specialist accepts the grievance, the grievance is logged into the prison's computer system and filed with any other grievances filed by that same prisoner. The grievance is marked on the prisoner's log with "I – Formal Grievance." The grievance specialist has fifteen business days to investigate and give a response.

A prisoner who is dissatisfied with the prison's response can appeal the response with State Form 45473. Any appeal is due within five business days of the date of the grievance response. A prisoner can also appeal a grievance if there's no response within twenty business days of when the grievance specialist received the response. An offender grievance specialist is to log the date of receipt of the appeal and forward the appeal to the warden. The warden or his designee is to review the appeal within ten business days of receiving the appeal, and the offender grievance specialist is to give a copy of the appeal response to the prisoner.

A prisoner dissatisfied with the warden's decision can lodge an appeal with the Indiana Department of Correction. The prisoner must check the "disagree" box on the warden or his designee's response and submit the response with the completed State Form 45473 and any supporting documentation. This appeal must be made to the offender grievance specialist within five business days of the warden or his designee's appeal response. A prisoner can also appeal if there's no response within ten business days of when the warden received the

first-level appeal. The offender grievance specialist is to document the appeal in the grievance database, logging the prisoner's grievance history with "II – Formal Appeal." An appeal of the warden's decision is reviewed by the Department Offender Grievance Manager and is considered final.

The parties disagree over how this policy was implemented and how Mr. Bennett used the grievance process.

### Warden Hyatte and Deputy Warden Payne's Account

Warden Hyatte and Deputy Warden Payne assert that Mr. Bennett didn't exhaust the grievance process. Their evidence includes the Indiana Department of Correction's Offender Grievance Process, Policy and Administrative Procedure 00-02-301, [Doc. 14-2], Mr. Bennett's grievance history, [Doc. 14-3], and a declaration of Michael Gapski, a grievance specialist at Miami Correctional Facility. [Doc. 14-1]. They also include in response to Mr. Bennett's motion for summary judgment Mr. Bennett's bed location history within the prison, [Doc. 39-1], grievance documents relating to Jeremy Blanchard (a plaintiff in a different consolidated case), [Doc. 39-2], and signed orientation paperwork from Mr. Bennett. [Doc. 39-3].

Mr. Gapski reviewed documents relating to Mr. Bennett's grievance history and attests to the grievance policy just described. He then attests to Mr. Bennett's documented grievance history. He says the grievance specialists received a grievance from Mr. Bennett on May 25, 2021. Mr. Bennett claimed in the grievance that he didn't get a shower every three days as was required and

6

he requested more items to use during showers. Mr. Gapski responded on June 17, 2021, saying that a lieutenant was contacted who said that the unit officer was responsible for getting prisoners their property and that showers are completed every three days. The grievance response said that addressed the grievance and the grievance was logged as grievance number 127795.

Mr. Gapski's office received another grievance on June 1, 2021, from Mr. Bennett, dated May 12, complaining about showers and requesting a transfer. Mr. Gapski responded on June 23, 2021, saying he contacted the same lieutenant. The lieutenant said, "As far as I see they have been doing showers." Mr. Gapski relayed this information in response to the grievance. He also added that transfer isn't allowed as a remedy and that the prison made personnel changes to ensure compliance with procedures. The grievance was logged as grievance number 128037. Mr. Bennett's grievance history supports Mr. Gapski's account of these two grievances. [Doc. 12-3].

Mr. Gapski further attested that Miami Correctional Facility had no records of appeals by Mr. Bennett. He attested that the warden and central office can't respond to issues if they don't receive appeals and that "[i]f [Mr.] Bennett had submitted a formal grievance appeal of any kind, the Warden and/or Central Office would have received it and responded to it, in accordance with procedure." [Doc. 12-1 at 7].

Mr. Bennett's bed location history shows that he was moved back to restrictive housing from April 26 to June 4, 2021. [Doc. 39-1]. The signed

orientation paperwork includes Mr. Bennett's signature acknowledging that he received information about appeals and grievances. [Doc. 39-3].

The defendants also include grievance documents relating to Jeremy Blanchard, who filed a similar complaint in a consolidated case. [Doc. 39-2]. The documents support that Mr. Blanchard filed a grievance and two levels of appeal. The defendants didn't invoke the exhaustion defense against his claims.

*Mr. Bennett's Account*

Mr. Bennett asserts that he exhausted all administrative remedies available to him. His evidence includes his own declaration, [Doc. 33-7 at 1–4], the deposition transcript of Michael Gapski, the already-mentioned grievance specialist at Miami Correctional Facility who also served as Rule 30(b)(6) representative for the prison, [Doc. 30-1], the deposition transcript of Charlene A. Burkett, the Director of the Indiana Department of Correction Ombudsman Bureau, [Doc. 30-22 to 30-5], and the deposition transcript of Stacy Hall, a correctional officer and law librarian at Miami Correctional Facility, [Doc. 30-6].

According to Mr. Bennett's declaration, he was placed in A-Unit restrictive housing in early February 2021 and was kept there until late March 2021. He filed a grievance about three days after arriving. He complained about the cell's darkness and obstructed window. He wrote the grievance while out of the cell for a shower and placed the grievance in a counselor's box, and also included a separate grievance about lack of medical care. Mr. Bennett didn't receive a response, so he asked Mr. Samuelson, the counselor, if he had turned in Mr.

Bennett's grievance. Mr. Samuelson replied that he had and that Mr. Bennett just had to give time for a response. He never received a response and wasn't told that he could appeal a non-response. On the contrary, Sgt. Martin told Mr. Bennett that he had to use a Department of Correction Form to appeal.

Mr. Bennett could use his tablet to communicate with the Ombudsman, so he eventually complained to the Ombudsman that he never received a response to his grievance. The Ombudsman's office responded that there was no record of his grievance and that he should file another. Mr. Bennett complained in another grievance about the darkness and the lack of any response to his other grievance. He gave the grievance to Mr. Hoffman, who Mr. Bennett thinks was the unit's counselor at the time. Mr. Bennett never received a response.

Mr. Bennett also recounts that he was formerly imprisoned at Wabash Valley Correctional Facility. He claims that there he promptly received notice when the prison received a grievance, and that if his grievance was denied, he'd promptly receive an appeal form that allowed him to mark "disagree."

Mr. Bennett presents Mr. Gapski's testimony as evidence that Miami Correctional Facility didn't follow department policy and made the grievance process impossible. Mr. Gapski, a grievance specialist at Miami Correctional Facility, testified as Miami Correctional Facility's Rule 30(b)(6) representative and described how grievance specialists at Miami Correctional Facility handled the grievance process. He explained that in restrictive housing, like Mr. Bennett's unit, a prisoner wishing to file a grievance would complete a grievance form, hand it to a correctional officer, and the correctional officer would put the

grievance in prison intraoffice mail to be delivered to the grievance specialists. No grievance is logged until a grievance specialist receives the grievance, and grievance specialists have no way of knowing whether or when a correctional officer accepted a prisoner's grievance, which correctional officer accepted a grievance, or what happened to a grievance that was sent but never received.

Mr. Gapski also described how Miami Correctional Facility handles appeals. The Indiana Department of Correction policy says a prisoner can appeal the prison's response to a grievance. A prisoner can appeal the prison's response or "may appeal as though the grievance had been denied" if there's no response within twenty business days of the offender grievance specialist's receipt of the grievance. [Doc. 12-2 at 12]. The policy adds that a prisoner who wishes to file a first-level appeal must complete State Form 45473 and submit it within five business days of the date of the grievance response.

Mr. Gapski explained things differently, explaining an extra unofficial step at Miami Correctional Facility. He said that the prison responds to grievances with an Offender Grievance Response Report. That report explains the prison's response and has a spot to mark "agree" or "disagree." It isn't State Form 45473, which the written policy requires for starting an appeal. If a prisoner wants State Form 45473, he marks "disagree" on the Offender Grievance Response Report and sends it to the grievance specialists. When a grievance specialist receives the report marked "disagree," the specialist sends a copy of State Form 45473 to the prisoner. That copy comes from a grievance specialist and must include the original grievance number on it. [Doc. 30-1 at 46–47]. The grievance specialists

10

forward an appeal to the warden and send a receipt to the prisoner only once the specialists have received a completed State Form 45473.

Mr. Gapski also spoke of how timing is calculated. The grievance policy requires that a prisoner "submit a completed State Form 45471, 'Offender Grievance,' no later than ten (10) business days from the date of the incident given rise to the complaint." [Doc. 12-2 at 9]. The same is true for appeals, except that a prisoner has five business days instead of ten. [Doc. 12-2 at 14]. Mr. Gapski attested that grievance specialists calculate timing based on when they receive an appeal. So an appeal is deemed untimely if not *received* within five business days. Timing doesn't depend on when a prisoner signed an appeal or handed an appeal to a correctional officer, even though prisoners often can't give an appeal directly to a grievance specialist.[2]

Mr. Bennett presents deposition testimony of Charlene Burkett, the Director of the Department of Correction Ombudsman Bureau. The Ombudsman Bureau handles prison complaints independently of the Department of Correction and Indiana Department of Administration but doesn't have enforcement power. The Ombudsman Bureau received several complaints from plaintiffs in the consolidated cases, each claiming that Miami Correctional Facility didn't respond to their grievances.

---

[2]     The defendants contend that Mr. Gapski's testimony about timing was only about appeals and not first-level grievances, so Mr. Gapski's testimony can't be used to generalize about how first-level appeals are handled. [Doc. 40 at 11].

Likewise, Officer Stacy Hall, who was a law librarian in May or June 2021, attested that thirty to forty prisoners complained to her that their grievances didn't receive responses.

DISCUSSION

Mr. Bennett and the defendants move for summary judgment on the exhaustion defense. The Prison Litigation Reform Act limits prisoner's ability to sue over prison conditions: "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Act's purpose is to reduce the number and improve the quality of prisoner suits, Woodford v. Ngo, 548 U.S. 81, 94 (2006), and the administrative exhaustion requirement achieves that purpose by "permit[ting] the prison's administrative process to run its course before litigation begins." Cannon v. Washington, 418 F.3d 714, 719 (7th Cir. 2005) (per curiam). Requiring administrative exhaustion might let the prison respond to the grievance in a manner acceptable to the prisoner, avoiding litigation altogether. Dole v. Chandler, 438 F.3d 804, 809 (7th Cir. 2006).

The Act's exhaustion requirement demands strict compliance. Id. "To exhaust remedies, a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002). Yet a prisoner need exhaust only "such

12

administrative remedies as are available." 42 U.S.C. § 1997e(a); a prisoner "need not exhaust unavailable ones." Ross v. Blake, 578 U.S. 632, 642 (2016).

Administrative remedies are unavailable despite their availability on paper in three sorts of circumstances. Id. at 643. First, administrative remedies are unavailable when their procedures operate as a dead end, be that because prison officials are unwilling or unable to provide relief. Id. Second, administrative remedies are unavailable when their procedures are so "opaque" and difficult to understand or navigate that they're practically of no use. Id. at 643–644. Third and finally, administrative remedies are unavailable when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 644.

The PLRA's administrative exhaustion requirement is an affirmative defense belonging to a defendant. Jones v. Bock, 549 U.S. 199, 216 (2007). A defendant invoking the defense must prove that "an administrative remedy was available and that [the plaintiff] failed to pursue it." Thomas v. Reese, 787 F.3d 845, 847 (7th Cir. 2015). Whether a plaintiff exhausted administrative remedies is decided by a judge rather than a jury. Pavey v. Conley, 544 F.3d 739, 741 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne's legal argument is straightforward: the prison's policies plainly require two levels of appeal for administrative remedies to be exhausted. Their records don't show that Mr. Bennett's successfully filed a grievance or appealed any grievance about his cell's conditions, so he must not have exhausted administrative remedies.

13

Mr. Bennett's argument is similarly straightforward: the prison didn't respond to grievances and didn't have a process to appeal non-responses, so administrative remedies weren't available.

Approaching from Mr. Bennett's perspective makes for a clearer picture.

Mr. Bennett points to his actions and Miami Correctional Facility's inaction and silence to show that he exhausted available remedies. His declaration describes two grievances about his cell conditions while he was in restrictive housing in February and March. He put the first in the unit counselor's box and he handed the second to who he believes was Mr. Hoffman. Neither grievance received a response. Mr. Samuelson told Mr. Bennett that he just had to wait and another prison official, Sgt. Martin, told Mr. Bennett that he had to use a Department of Correction form to appeal. Mr. Bennett emphasizes that he tried to appeal by pointing to his communications with the Ombudsman.

According to Mr. Bennett, this evidence shows that administrative remedies weren't available because the prison didn't respond to his grievances or appeals. He says that prison officials' consistent failure to respond meant that the process wasn't available. *See* Lewis v. Washington, 300 F.3d 829, 833 (7th Cir. 2002).

This argument appears to hit a snag with the grievance policy. A prisoner must follow any prison rules that require administrative appeals, id. (citing Pozo v. McCaughtry, 286 F.3d 1022, 1025 (2002)), and Miami Correctional Facility's

policy required notifying grievance specialists of non-responses and also required that prisoners appeal non-responses.

According to policy, a grievance specialist is to send the prisoner an "unacceptable form" rejecting a grievance or a notice of receipt of an accepted grievance within ten business days of receipt. If the prisoner doesn't receive either within ten business days of submitting it, the prisoner is to notify the grievance specialist of the non-response and retain a copy of the prisoner's own notice to the grievance specialist. The grievance specialist is to respond to that notice within ten business days. The policy then also required that a grievance specialist respond to a grievance within fifteen business days of receipt. If a prisoner didn't receive a response within twenty business days of when the grievance specialists received a grievance, a prisoner was to appeal as if a response had come. The warden was to respond to an appeal within ten business days of receiving the appeal. If he didn't respond by then, a prisoner could appeal as if a response had come. Under these rules, Mr. Bennett would exhaust administrative remedies only if he appealed the lack of a response to a grievance and appealed the lack of a response to his appeal.

This appeals process makes little sense. The part of the policy requiring that a prisoner file a notice of non-response says that the prisoner must do so if ten business days have passed since submitting a grievance. It doesn't give a deadline by which the prisoner must notify the grievance specialist, suggesting that the step isn't mandatory. Nor does the policy define when a grievance is "submitted." Most deadlines in the grievance policy are based on when a prison

official receives a grievance or appeal. It's unclear if a grievance is submitted when the grievance is received, which the prisoner would have no way of knowing, or when the prisoner signed the grievance, hands it to a prison official, or puts it in an outbox, which the policy doesn't address. The policy doesn't say how to provide this notice and the prison don't have a form for this purpose; Mr. Gapski testified that there's not a standard form and prisoners can "write on anything." [Doc. 30-1 at 33].

This step's necessity is further obscured by its relation to the first-level appeal. First, the policy at one point says a prisoner "shall" notify the grievance specialist of a non-response [Doc. 12-2 at 9] while saying at another point that the only recognized process includes: (1) a formal attempt to resolve concerns; (2) a written appeal to the warden; and (3) a written appeal to the department grievance manager. [Doc. 12-2 at 3]. Second, the policy says a prisoner can appeal a non-response as if there'd been a response if twenty business days have passed from the grievance specialist's receipt of the grievance. The policy doesn't say that the prisoner can appeal only once he's filed a notice of non-response or once a grievance specialist has responded to a notice of non-response. This part of the policy is opaque and incapable of use for non-responses.

Appealing non-responses is likewise confusing. The prisoner can notify the grievance specialist of a non-response after ten days of submitting it, but a prisoner can file an appeal only by filing State Form 45473. Mr. Gapski describes an unauthorized step requiring a prisoner to first mark another form with

"disagree" before receiving State Form 45473. But a prisoner can't mark "disagree" on a form he never receives. This is a dead end.

The defendants insist that Miami Correctional Facility recognizes only the official policy, contrary to what Mr. Gapski says. But even if the prison follows the written policy to a tee, appeals are unavailable for non-responses. The policy tells prisoners to appeal as if the grievance had been denied but doesn't say how a prisoner is to get a copy of State Form 45473,[3] much less how a prisoner in restrictive housing, like Mr. Bennett was, is to get ahold of State Form 45473.

The same deficiencies apply to the second-level appeal. Policy dictates that a prisoner starts a second-level appeal by marking the warden's first-level response with "disagree." The defendants and the policy don't explain how a prisoner who receives no response to the first-level appeal can mark "disagree" on a form that they don't have and that might not even exist.

Mr. Bennett bolsters his case with Mr. Samuelson and Sgt. Martin's statements. Mr. Samuelson told Mr. Bennett he just had to wait for a response (not file a notice of non-response or appeal) and Sgt. Martin told Mr. Bennett he needed to use Department of Correction forms to appeal. These statements, Mr. Bennett says, show that prison staff prevented him from using the administrative process. *See* Kaba v. Stepp, 458 F.3d 678, 684 (7th Cir. 2006) ("[W]hen prison

---

[3]     Mr. Bennett asserts that the only way a prisoner gets State Form 45473 is to receive one from a grievance specialist after completing the unofficial and unauthorized step. The defendants object to this assertion as not supported by Mr. Gapski's testimony — he said that State Form 45473 comes from him but didn't exactly say that there was no other way to get the form. [Doc. 30-1 at 47]. Still, the defendants never explain how a prisoner who doesn't receive a response can get State Form 45473, nor does the written policy address this crucial step.

officials prevent inmates from using the administrative process . . . the process that exists on paper becomes unavailable in reality.").

If Mr. Bennett is believed, he has exhausted *available* remedies. Mr. Bennett could have notified the grievance specialist of the non-response, but the policy lacks detail of how or when to do this and doesn't say that this is a prerequisite to the mandatory appeal of a non-response. Mr. Bennett could appeal the prison's lack of response after the prison's time to respond lapsed, but that appeal was made impossible because Miami Correctional Facility required State Form 45473 to appeal. It provided State Form 45473 form only after a prisoner completed the unauthorized intermediate step involving the Offender Grievance Response Report. If the defendants are right and they followed the policy word for word, they still don't explain gaps in the policy that don't account for non-responses. Nothing in the written grievance policy tells a prisoner how to appeal if he never receives a response or State Form 45473. Ultimately, the policy's rules about appeals are "based on the assumption that the prisoner has received a response to his original grievance," and doesn't account for non-responses. Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *8–9 (S.D. Ind. Jan. 10, 2011). This policy gap means "there is no adequate appeals process," so Mr. Bennett "cannot be faulted for failing to appeal." Id. (citing Dole v. Chandler, 438 F.3d 804, 809–810 (7th Cir. 2006)).[4]

---

[4]     Another gap in the policy involves timing. Mr. Bennett had to appeal a non-response within twenty business days of when grievances specialists received a grievance or ten business days of when the warden received an appeal. Timing didn't depend on when Mr. Bennett signed or sent a grievance or appeal, and he had no way of knowing when someone else received his grievance or

The defendants try to undermine Mr. Bennett's evidence. First, they characterize Mr. Bennett's declaration as self-serving and insist that it is therefore of no use at summary judgment unless unaccompanied by other evidence. [Doc. 41 at 6]. (citing Buie v. Quad/Graphics, Inc., 366 F.3d 496, 504 (7th Cir. 2004)). They say that without copies of his grievances, Mr. Bennett's declaration is "without factual support on the record." Buie v. Quad/Graphics, Inc., 366 F.3d at 504.

The rule that a self-serving declaration or affidavit alone can't defeat summary judgment has been bad law for a decade in this circuit. Hill v. Tangherlini, 724 F.3d 965, 967–968 (7th Cir. 2013) ("[T]he term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment."). The court of appeals expressly overruled a litany of its cases "to the extent that they suggest a party may not rely on 'self-serving' evidence to create a material factual dispute." Id. at 967 n.1. A self-serving declaration can defeat summary judgment as long as it meets the requirements of any declaration. Foster v. PNC Bank, 52 F.4th 315, 320 (7th Cir. 2022).[5] The self-serving nature of Mr. Bennett's declaration isn't reason to discard it.

---

appeal. A prisoner who doesn't receive a response is apparently left to speculate about when an appeal of a non-response is due.

[5]      In the same paragraph the defendants cite to denigrate Mr. Bennett's declaration, the court explained, "[t]he record, moreover, may include the self-serving affidavit itself, provided that the affidavit meets the usual requirements for evidence on summary judgment—including the requirements that it be based on personal knowledge and that it set forth specific facts showing that there was

The defendants then object to Mr. Bennett's use of the Ombudsman's deposition, arguing it's irrelevant. They contend that nothing about the Ombudsman is relevant to whether administrative remedies were available to Mr. Bennett or whether he "complied with the letter of that process." [Doc. 41 at 7]. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. As Mr. Bennett correctly points out, the Ombudsman's testimony would tend to make it more probable that Mr. Bennett's grievances were two of many that went unanswered. The objection is overruled.

Next, the defendants argue that the declaration's claims about what Mr. Samuelson and Sgt. Martin said are inadmissible hearsay and move to strike them. Hearsay is an out-of-court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c). Inadmissible hearsay can't be used at summary judgment. Carlisle v. Deere & Co., 576 F.3d 649, 655 (7th Cir. 2009).

Mr. Bennett explains that the statements aren't offered for their truth — he isn't trying to prove that Mr. Samuelson correctly said that he had submitted the grievance and that Mr. Bennett had to wait for a response to appeal; nor that Sgt. Martin correctly said that Mr. Bennett had to use a Department of Correction form. Mr. Bennett brought these statements to show that he was given bad information. The statements aren't offered for the truth of the matters asserted, so the court overrules the objection and denies any motion to strike.

---

a genuine issue for trial." Buie v. Quad/Graphics, Inc., 366 F.3d at 504 (citations and quotations omitted).

After their evidentiary objections, the defendants point to evidence of other prisoners who exhausted remedies to argue that administrative remedies were available. They cite evidence that Mr. Blanchard successfully exhausted all prescribed remedies in his case, 3:21-CV-160. So, they say, "the evidence in the record shows that at least some offenders in the restrictive housing cells were able to fully exhaust their administrative remedies contradicts Mr. Bennett's claim that the administrative remedies were systematically unavailable." [Doc. 41 at 9].

That the prison logged and responded to another prisoner's grievances and appeals doesn't contradict Mr. Bennett's claims. Mr. Bennett claims that *his* grievances didn't receive a response, not that no grievance ever received a response. He relies on evidence of systemic failures to bolster his claim, but his claim rests on his declaration.

Mr. Blanchard's experience stands in contrast to Mr. Bennett's, but the contrast supports Mr. Bennett's claims. Mr. Blanchard successfully filed a grievance and both levels of appeal. Unlike Mr. Bennett, Mr. Blanchard received responses, so he could file an appeal. Mr. Bennett has shown that appeals were unavailable unless a prisoner received a response. Mr. Blanchard's exhaustion doesn't fix the policy's impossible task of appealing a non-response when an appeal requires a form that comes only with a response.

Warden Hyatte and Deputy Warden Payne's reasons to reject Mr. Bennett's evidence and arguments are unpersuasive, so Mr. Bennett has created a genuine dispute of fact as to exhaustion. Mr. Bennett is entitled to judgment on the

21

affirmative defense unless the defendants can somehow prove they're nevertheless entitled to judgment or can show that there's a genuine dispute of material fact requiring a Pavey hearing. *See* Pavey v. Conley, 544 F.3d 739 (7th Cir. 2008).

Warden Hyatte and Deputy Warden Payne argue that they're entitled to summary judgment because they have no institutional records of Mr. Bennett's grievances and appeals about housing conditions. If there are no records of grievances or appeals, he must not have exhausted administrative remedies.

The defendants rely on Mr. Gapski's declaration. He attests that Miami Correctional Facility follows only the official policy and that prison records include no grievances from Mr. Bennett about cell conditions. He says that "[a]bsent any grievance appeals being submitted in relation to an offender's claims, the Warden and/or Central Office cannot respond to the purported issue as they never receive notice of it." [Doc. 12-1 at 7]. Furthermore, "[i]f [Mr.] Bennett had submitted a formal grievance appeal of any kind, the Warden and/or Central Office would have received it and responded to it, in accordance with procedure." Id.

The defendants also rely on Mr. Bennett's grievance records. Those records show that Mr. Bennett successfully submitted some grievances about things other than his cell conditions. They also Mr. Bennett's signed acknowledgement that he received the grievance policy, too.

Finally, the defendants include evidence that Mr. Blanchard filed a grievance that received a response and successfully appealed the response twice.

Mr. Gapski's statements, taken as true, don't create a genuine issue of material fact. He insists that the prison recognizes only the official policy. The prison can officially recognize one policy while staff follow unauthorized processes, which is what Mr. Gapski testified to. His assertion doesn't controvert that prisoners must complete an Offender Grievance Response Report to get State Form 45473, which is required for appeals. Then Mr. Gapski insists that the warden or central office would have received and responded to any appeal Mr. Bennett submitted. This assumes that Mr. Bennett received a response that he could use to appeal, and that no roadblocks stood between Mr. Bennett and the warden or central office receiving the appeal. As explained before, Mr. Gapski's testimony shows that Mr. Bennett had to rely on correctional officers to deliver grievances and appeals, that submitting an appeal required completing the unauthorized Offender Grievance Response Report, that Mr. Bennett couldn't appeal non-responses because without a response, and that he didn't have the required State Form 45473. If Mr. Gapski is right, then the warden and central office do respond to all appeals that they receive. Yet his declaration doesn't create a genuine issue about whether the steps leading up to the warden or central office's receipt of an appeal were available to Mr. Bennett.

Nor does Mr. Bennett's grievance history or Mr. Blanchard's grievance history controvert Mr. Bennett's evidence that administrative remedies were unavailable. That Mr. Bennett successfully submitted grievances at other times doesn't controvert that he didn't have available administrative remedies while in restrictive housing. The gaps in the policy already identified would explain how

23

some grievances got lost or discarded. And Mr. Blanchard's ability to fully exhaust according to the policy doesn't show that Mr. Bennett could have — it doesn't controvert Mr. Bennett's claim that he didn't receive responses and it doesn't explain how Mr. Bennett was supposed to appeal a non-response. Mr. Blanchard received a response; Mr. Bennett didn't.

So while the defendants claim that the lack of institutional records of *these* grievances shows non-exhaustion, the lack of records is consistent with Mr. Bennett's version of events. As Judge Barker, in a similar case, explained:

> Although there is no record of any of these grievances in the prison database, that record is obviously only accurate as to the grievances that are actually inputted into the system by prison officials. In other words, even if a prisoner properly submits a grievance to an appropriate prison official, if the prison grievance specialist does not receive it, either because it is lost or forgotten, or if the grievance specialist fails for some other reason to input the grievance into the system, there would be no record of it having been filed.

Knighten v. Mitcheff, No. 1:09-cv-333, 2011 U.S. Dist. LEXIS 2910, at *6–7 (S.D. Ind. Jan. 10, 2011).[6] The defendants' evidence shows that Mr. Bennett's grievances about cell conditions didn't get logged. That's entirely consistent with Mr. Bennett's evidence and the policy of logging grievances only once they're received.

The defendants argue that administrative remedies were available to Mr. Bennett because he can't claim he didn't understand the process. They rely on

---

[6]     The defendants say their facts are distinct from those in Knighten v. Mitcheff  because that plaintiff had copies of grievances plus his own testimony while Mr. Bennett only has his testimony. This distinction depends on the rule that a self-serving declaration isn't competent evidence. That rule, for reasons already explained, has long been put to rest.

the form Mr. Bennett signed, acknowledging receipt of the grievance policy as well as the other grievances he filed from restrictive housing. But this evidence doesn't contradict Mr. Bennett's claims that his grievances related to cell conditions never received responses and his evidence that gaps in the policy (grievances aren't marked until received, the grievance specialists don't know who collects a grievance and when, and the like) allow grievances to go missing. His knowledge of the procedure doesn't show that he failed to exhaust by not appealing, either, when he's shown that appealing non-responses was impossible in practice.

Next, the defendants argue that Mr. Bennett wasn't hindered from exhausting the administrative process because the evidence of Mr. Samuelson's and Sgt. Martin's statements aren't admissible. As explained before, their statements aren't offered for the truth asserted, so the statements are admissible to show the effect they had on Mr. Bennett, that is, to show that they "thwart[ed] [Mr. Bennett] from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Ross v. Blake, 578 U.S. 632, 644 (2016).

But the defendants then say that even if the prison officials' statements are admissible, Mr. Bennett still didn't exhaust administrative remedies because Mr. Bennett didn't send a notice of non-response to the grievance specialists. As explained earlier, that part of the policy lacked a deadline and wasn't explained as a prerequisite to appealing. The policy didn't make clear that it was mandatory and its confusing interaction with the regular appeals process makes it too opaque to follow.

25

Among their arguments that Mr. Rollins's evidence isn't enough, the defendants say that Mr. Rollins "is aware of how easy it is for inmates to make false claims that they filed grievances simply to get past the exhaustion requirement." [Doc. 41 at 13]. They imply that allowing a plaintiff to prove that attempts at exhaustion were frustrated by a prison's non-response would undermine the Prison Litigation Reform Act by making the exhaustion defense meaningless.

First, Mr. Bennett presented other evidence that remedies were unavailable, so he didn't rest merely on the lack of records.

Second and more fundamentally, a prisoner's word might be all that he has. If a prison loses grievances before they're filed, a plaintiff often has only the lack of records and his own word to show exhaustion of remedies. As Judge D'Agostino observed, "it is unclear what evidence Defendants expect Plaintiff to produce of his grievances that were allegedly discarded by corrections officers." Reid v. Marzano, No. 9:15-CV-761, 2017 U.S. Dist. LEXIS 38547, at *10 (N.D.N.Y. Mar. 17, 2017).[7] Judge D'Agostino noted that a prisoner would ideally keep photocopies for his records, but that doing so was unrealistic because the plaintiff didn't have access to the law library. Id. The same is true for Mr. Bennett,

---

[7]     The defendants argue Reid v. Marzano is distinguishable because it was about New York's prisons, not Indiana's. [Doc. 41 at 14]. That is a distinction without a difference.

The defendants then attempt another distinction: Miami Correctional Facility's policy told prisoners to inform grievance officials about non-responses and required appeals of non-responses after a certain period, but the New York prison didn't. For reasons already explained, Miami Correctional Facility's policies were opaque and dead ends, so they don't contradict the principles explained in Reid v. Marzano.

even if he doesn't specifically allege that correctional officers discarded his grievances; he was in restrictive housing so it's unclear how he could have kept records for himself. And worse yet, taking the defendants' argument to its logical conclusion cuts against their own argument. Accepting that a prisoner can't rely on the lack of evidence of grievances would incentivize prisons to destroy or lose all grievances and prohibit prisoners from keeping copies of their grievances. A plaintiff would have only his word and the defendants could always reply, "our lack of records and your word aren't enough." The defendants warn against making the defense meaningless, but their position could lead to a perversely impenetrable defense.

In summary, the defendants' argument that the absence of evidence is the evidence of absence doesn't contradict Mr. Bennett's evidence that administrative remedies weren't available. The defendants' evidence is consistent with Mr. Bennett's claims, so doesn't create a genuine issue as to whether administrative remedies were available to Mr. Bennett. Administrative remedies weren't available to Mr. Bennett, so he satisfied 42 U.S.C. § 1997e(a) before suing.

A court normally holds a <u>Pavey</u> hearing to resolve factual disputes bearing on administrative exhaustion, but needn't hold a hearing if it can resolve the issue of exhaustion on the documentary evidence. <u>Bessler v. Wexford of Ind. LLC</u>, No. 3:21-CV-691, 2022 U.S. Dist. LEXIS 199409, at *7–8 (N.D. Ind. Nov. 2, 2022). Neither party requested a <u>Pavey</u> hearing and the consistency between Mr. Bennett's claim of exhaustion and the defendants' evidence means there's no

genuine issue of material fact. Accordingly, the court denies the defendants'
motion for summary judgment and grants Mr. Bennett's motion for summary
judgment without a <u>Pavey</u> hearing.

Mr. Bennett requested oral argument to help the court narrow its focus on
the voluminous records and briefs across the consolidated cases. Oral argument
is unnecessary, so the court denies the request for oral argument.

CONCLUSION

For these reasons, the court DENIES the defendants' motion for summary
judgment; GRANTS Mr. Bennett's motion for summary judgment; REJECTS the
exhaustion defense; and DENIES AS MOOT Mr. Bennett's motion for
consolidated oral argument.

SO ORDERED.

ENTERED:   August 15, 2023

_____/s/ Robert L. Miller, Jr._
Judge, United States District Court

28